793 So.2d 500 (2001)
O. Kyle BRADLEY, d/b/a Kyle Bradley Logging, Plaintiff-Appellee,
v.
H. Wayne SHARP, Jr., James Richard Brown, Jr., Charlotte Brown Bonham, Sandra J. Brown Kenna, and Richea Kaye Brown Gaston, Defendants.
No. 35,034-CA.
Court of Appeal of Louisiana, Second Circuit.
August 22, 2001.
*501 Claire P. Sharp, Jack Arlen Williams, Shreveport, Counsel for defendant-appellant, H. Wayne Sharp, Jr.
Jones, Odom, Davis & Politz by John S. Odom, Jr., Shreveport, Counsel for plaintiff-appellees.
Hal V. Lyons, Shreveport, Counsel for defendant-appellees, James Richard Brown, et al.
Before CARAWAY, KOSTELKA and DREW, JJ.
CARAWAY, J.
This case involves a dispute between the owner of standing timber, the plaintiff, and *502 the owner of the land, the defendant. Both owners acquired their property from a common ancestor-in-title by purchases that occurred within two days of each other. The sale of the pine timber occurred first, and the deed to the land to defendant made reference to the prior timber sale. Defendant recorded his deed before the recordation of plaintiff's timber deed. Although plaintiff was allowed to harvest some timber during the term of his 18-month contract, defendant ultimately blocked plaintiff from cutting all of the pine timber, and this suit was filed. Claiming that the public records doctrine protects him and that plaintiff damaged his property and the hardwood timber, defendant appeals the trial court's ruling awarding damages to plaintiff. We affirm the ruling.

Facts
Plaintiff, O. Kyle Bradley, d/b/a Kyle Bradley Logging ("Bradley") brought this suit after he was denied access to a tract of land by defendant, H. Wayne Sharp, Jr. ("Sharp"), to harvest timber that Bradley purchased from Charlotte Brown Bonham, Sandra J. Brown Kenna and Richea Kaye Brown Gaston (the "Browns"). Sharp bought the tract of land from the Browns and recorded his deed to the property nearly two weeks before Bradley's recordation of the timber deed.
The disputed transactions arose after the Browns announced their intention to sell certain property in an October 9, 1997 prospectus letter entitled "Timber/Land Sale on Cross Lake." The timber land consisted of approximately 159 acres near Cross Lake in Caddo Parish. The prospectus instructed Bradley, Sharp and other interested bidders that they could bid on the tract for the land or timber or a combination thereof, including the purchase of the pine timber only on the 159 acres, or the purchase of the hardwood and land. Furthermore, in reference to bid option No. 4, the hardwood and land option, the prospectus stated that bidders "will assume the pine is being sold separately with an 18 month harvest contract." Sharp submitted a bid, in accordance with the prospectus for options 4 and 6, regarding the hardwood timber only and the land on the 159-acre tract plus an adjacent 3-acre tract on the lake with a brick home.
On November 11, 1997, Bradley entered into a Timber Deed with the Browns, purchasing all merchantable pine trees on the 159-acre tract for $227,650. The Timber Deed recited several terms and conditions. First, Bradley was granted the right of ingress and egress upon the land to "cut and fell trees and to carry the same away," until May 10, 1999. After May 10, 1999, any merchantable timber remaining on the tract was to revert to the Browns as sellers of the timber. Secondly, Bradley agreed to conduct all of his logging operations in accordance with Forestry Best Management Practices, agreeing not to litter the tract and to minimize damage to the property. The Timber Deed further provided for specific damages to trees wrongfully cut as follows: Hardwood Saw timber$450/MBF and Hardwood Pulpwood $45/cord. The parties agreed that the volume of hardwood timber wrongfully cut was to be determined by Bayou State Timber Services, Inc. ("Bayou State"). Bradley did not record the Timber Deed until December 22, 1997.
Sharp entered a $95,000 bid and signed a purchase agreement with the Browns for the 159-acre tract and hardwood timber on November 13, 1997. In the purchase agreement, the Timber Deed is referred to as follows:
"Closing date shall be prior to December 1, 1997 but no sooner than 15 days after acceptance by all parties. This date is contingent upon completion of *503 an attorney's title opinion, survey and a current timber contract which expires May 10, 1999. All rights in timber contract are to be assigned in land sale.
* * * * *
Buyer is aware that the pine timber is sold on an 18 month contract." (Emphasis ours)
The 159-acre tract was sold by a cash sale deed in accordance with the purchase agreement on November 24, 1997, and was recorded on December 9, 1997. The deed, which was drafted by Sharp's attorney, acknowledges the existence of the Timber Deed as follows:
"PURCHASER hereby acknowledges the existence of a timber contract between SELLER and O. Kyle Bradley Logging of Texas (hereinafter "TIMBER BUYER"). SELLER herein agrees that the rights of timber and trees revert at the expiration of the timber contract to SELLER are hereby specifically transferred and assigned to PURCHASER.
* * * * *
SELLER agrees to and shall indemnify and hold harmless PURCHASER and subsequent landowners, their officers, agents, employees, heirs and assigns from and against any and all claims, losses, damages causes of action, suits and liability of every kind, including all expenses of litigation, court costs and attorney's fees, for injury to or death of any person, or for damage to any property, arising out of or in connection with the operations under the timber contract executed between SELLER and TIMBER BUYER whether or not such injuries, death or damages, are caused by TIMBER BUYER or SELLER's sole negligence or the joint negligence of TIMBER BUYER and any other person or entity.
Bradley removed the timber in accordance with the Timber Deed until November 28, 1997. Rain forced the operation to halt from November, 1997, until July 10, 1998. On July 27, 1998, Sharp denied Bradley access to the Tract, claiming that Bradley damaged too many hardwood trees, as well as a cemetery on the northern part of the tract which was specifically flagged as a no logging area. Pursuant to negotiations with Sharp, Bradley paid a $3,400 "deposit" to cover potential damages to the property and/or the hardwood trees that could occur during harvesting of the pine timber. Ultimately, in late July 1998, Sharp blocked the access road leading to the remaining pine timber and informed Bradley that he could no longer harvest the timber on the tract, unless he returned with a court order. Efforts to negotiate any type of agreement to allow Bradley to continue harvesting the land failed. Bradley subsequently filed suit on May 8, 1999, claiming that his rights under the Timber Deed had been violated and seeking damages.
At trial, Sharp's testimony revealed that before he submitted his bid on the property, he expressed concern about the language of the Timber Deed. Sharp never denied knowing about the Timber Deed, nor did he claim that the reference to Bradley's deed in his purchase agreement and deed were in error. In fact, Sharp stated that upon his request, Harvey Bryant ("Bryant"), a Bayou State forester, gave him a copy of a timber deed with a different logger, and that he knew the rates he would be paid for damaged hardwood. Sharp further stated that he considered this information when preparing his bid.
Following a bench trial, the trial court rejected Sharp's claim that the public records *504 doctrine allowed him to disregard Bradley's Timber Deed. The court found that Sharp interfered with Bradley's right to cut the pine timber during the term provided in the Timber Deed and awarded damages to Bradley in the amount of $46,512.30 for the unharvested timber, as well as damages for lost crew time in the amount of $3,500, for a total of $50,012.30. The trial court awarded Sharp $1,500 on his defense and reconventional demand concerning damage to the hardwood timber resulting from Bradley's operations on the property. Sharp appeals the trial court's ruling.

Discussion

I.
Sharp's first assignment of error pertains to his defense that, having recorded his deed to the property 13 days before the recordation of Bradley's Timber Deed, he was a third party purchaser protected by the public records doctrine. He claims that since he did not expressly assume the obligations of the Timber Deed, he was unaffected by the timber sale and thus acquired ownership of the land and pine timber. To the contrary, the trial court ruled that despite the lack of Sharp's express assumption of the personal obligations of the Timber Deed, his acknowledgment of Bradley's unrecorded rights made Sharp's acquisition of the land subject to Bradley's ownership of the pine timber. From our review of the following authorities regarding the ownership of standing timber and the public records doctrine, we affirm the trial court's ruling.
The Civil Code articles pertaining to the ownership of standing timber are as follows:
La. C.C. art. 464: Buildings and standing timber are separate immovables when they belong to a person other than the owner of the ground.
La. C.C. art. 491: Buildings, other constructions permanently attached to the ground, standing timber, and unharvested crops or ungathered fruits of trees may belong to a person other than the owner of the ground. Nevertheless, they are presumed to belong to the owner of the ground, unless separate ownership is evidenced by an instrument filed for registry in the conveyance records of the parish in which the immovable is located.
The Louisiana law embodying the principles of our public records doctrine is as follows:
La. C.C. art. 1839: A transfer of immovable property must be made by authentic act or by act under private signature. Nevertheless, an oral transfer is valid between the parties when the property has been actually delivered and the transferor recognizes the transfer when interrogated on oath.
An instrument involving immovable property shall have effect against third persons only from the time it is filed for registry in the parish where the property is located.
La. R.S. 9:2721(A): No sale, contract, counter letter, lien, mortgage, judgment, surface lease, oil, gas or mineral lease, or other instrument of writing relating to or affecting immovable property shall be binding on or affect third persons or third parties unless and until filed for registry in the office of the parish recorder of the parish where the land or immovable is situated. Neither secret claims or equities nor other matters outside the public records shall be binding on or affect such third parties.
The Civil Code recognizes that standing timber may be a separate immovable belonging to a person other than the owner of the land. However, the ownership of both immovables, the land and the *505 standing timber, are interrelated and are not of equal rank in a manner which is analogous in many respects to the ownership of predial servitudes. Willetts Wood Products Co. v. Concordia Land & Timber Co., 169 La. 240, 124 So. 841 (La.1929), cert. denied, 281 U.S. 742, 50 S.Ct. 348, 74 L.Ed. 1156 (1930). For example, the owner of the land must subordinate the use of the land to the timber owner's dominant rights to grow and eventually harvest the timber. This horizontal division of land ownership gives rise to duties that are attached to the land, which are similar to those owed by the owner of a servient estate to the owner of a predial servitude. See, La. C.C. art. 651. Likewise, our supreme court has said that a timber owner's dominant rights are not perpetual so as to burden the full ownership and use of the land indefinitely and "put the land out of commerce." Willetts, 124 So. at 842. Therefore, the subordination of the landowner's use of the property is for a term fixed in the timber deed or set by a court. Id.; see also, A. Yiannopoulos, Property § 135, in 2 Louisiana Civil Law Treatise, 302-303 (3d ed.1991). This rule serves a purpose similar to that of the prescription of non-use which frees the ownership of the servient estate from the burden of the predial servitude. See, La. C.C. art. 753.
The Civil Code articles on ownership make clear that Bradley acquired a real right in immovable property through the Timber Deed. La. C.C. arts. 476 and 477. Furthermore, Bradley's real right of ownership of the standing timber burdened the ownership of the land, thereby giving rise to real obligations or duties attached to the land. La. C.C. art. 1763.[1] Those real obligations, as discussed above, made the Browns' ownership of the land subject to Bradley's rights to continue to grow the pine timber and to access the property to harvest the pine timber.
La. C.C. art. 1764 describes the effects of real obligations when the land burdened by such obligations is transferred:
A real obligation is transferred to the universal or particular successor who acquires the movable or immovable thing to which the obligation is attached, without a special provision to that effect. But a particular successor is not personally bound, unless he assumes the personal obligations of his transferor with respect to the thing, and he may liberate himself of the real obligation by abandoning the thing.
From this article, it can be seen that Sharp could acquire the land from the Browns and be subject to the real obligations arising from the Timber Deed, without assuming any personal obligations under the Timber Deed, such as the Browns' personal obligation of warranty of title. Therefore, the fact that Sharp's deed to the property did not employ language assuming the personal obligations of the timber contract is not dispositive.
The evidence at trial overwhelmingly revealed that Sharp and the Browns intended to recognize Bradley's ownership of the standing timber. In two written contracts, the purchase agreement and the cash sale deed, Sharp effectively acknowledged that his acquisition of the land would be subject to the real obligations flowing from Bradley's ownership of the timber. To that extent, the jurisprudence cited below indicates that under the public records doctrine, Sharp is not considered to be in the position of a protected third party purchaser *506 who can acquire ownership of the land free from the unrecorded document evidencing Bradley's ownership rights. Just as the public records doctrine is unnecessary to protect Bradley's ownership rights in the timber vis-a-vis the Browns, the doctrine is likewise inapplicable to afford Sharp protection, since the Browns contractually required Sharp to recognize Bradley's ownership rights as a burden or real obligation on the land which he was acquiring.
In Stanley v. Orkin Exterminating Co., Inc., 360 So.2d 225 (La.App. 1st Cir.1978), the purchaser of commercial property executed a purchase agreement acknowledging that the property was to be sold subject to a lease. At the time of execution of the deed to the property, however, there was no mention of the lease in the sale. When the purchaser sued to evict the tenant, the court determined that the apparent intent of the parties throughout the entire sales transaction was for the property to be sold subject to the lease. Thus, the purchaser's reliance upon the public records doctrine was rejected because of his contractual agreement to purchase the property burdened with the lease.
In the present case, the contractual intent was evidenced in the three written agreements pertaining to the sale of the land to Sharp: the prospectus, the purchase agreement, and the cash sale deed. Therefore, we reject as irrelevant Sharp's legal argument that he did not assume any personal obligation under the Timber Deed. We hold that Bradley's failure to timely obtain protection from the proper recordation of the Timber Deed was unnecessary because of Sharp's contractual acknowledgment of Bradley's rights. Sharp acquired the land subject to the real obligations owed to the owner of the pine timber.

II.
At the time that Bradley filed suit, he had harvested $218,305.77 worth of pine timber from the tract. Some pine timber remained on the property and, despite the pendency of the suit, Sharp harvested a portion of the remaining pine timber before trial. Based upon Sharp's conversion of that timber and the value of the small remaining portion of pine timber on the property, the trial court awarded Bradley damages for the loss of the pine timber.[2] As a portion of the trial court's computation of damages, the court offset the amount of $1,500 against Bradley's award, due to Bradley's incidental damage to the hardwood timber. In Sharp's second assignment of error, he claims that the amount of damage to the hardwood timber, as well as other damages to his property, total more than $1,500.
The trial court stated in its oral reasons for judgment that it believed that Bryant's $500 estimate of damages to the hardwood timber was pursuant to the Timber Deed and unbiased. Further, the trial court acknowledged that had Bradley been able to continue harvesting the pine timber, it is reasonable to assume that more hardwood would have been cut. As such, the trial court concluded that $1,500 would more than compensate Sharp. Insofar as the claims raised in Sharp's reconventional demandclaims for damages to the culverts and gates of adjacent landowners, *507 damage to a cemetery located on the property, damages for loss of a hunting lease, and damages for a decrease in property valuethe trial court ruled that Sharp failed to meet his burden of proof by a preponderance of the evidence. We agree.
A court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed even though an appellate court may feel that its own evaluations and inferences are as reasonable. Id.; Poret v. Billy Ray Bedsole Timber Contractor, Inc., 32,971 (La. App.2d Cir.4/5/00), 756 So.2d 664. When factual findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings, because only the fact finder can be aware of the variations and demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v.. ESCO, 549 So.2d 840 (La.1989); Poret, supra. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell, supra.
The trial court heard testimony from witnesses for both parties regarding the damage to Sharp's property resulting from Bradley's logging operation. Bryant testified on Bradley's behalf. Bryant stated that Bradley contacted him, pursuant to the dispute resolution section in the Timber Deed, in the summer of 1998 and informed him that there was a dispute over the amount of hardwood damage. Bryant went out to the property for an inspection and stated that he did not see any excessive hardwood damage. Bryant estimated that the value of the damaged hardwood timber was "no more than" $500. Also, contrary to Sharp's claims, Bryant did not see any damage to the cemetery, nor did he witness any excessive damages to the access roads. Bryant went so far as to say that he got the impression that Sharp wanted to be paid for every hardwood tree and sapling that was cut, even if it was not "wrongfully" damaged under the terms of the Timber Deed. James Bachman also testified on Bradley's behalf, concluding that the hardwood damage was not excessive and was within the normal acceptable range for a good logging job.
With regard to Sharp's claim that Bradley damaged the cemetery, Billy Smith, one of Bradley's foremen, stated that they did not damage the cemetery. In fact, Smith stated that Bradley left a good amount of pine timber inside the cemetery unharvested.
During Sharp's case-in-chief, he presented Steven Templin as an expert witness in forestry management. Templin's testimony focused more on the wording and interpretation of the Timber Deed than it did on placing any type of value on Sharp's alleged damages. He indicated that he had neither cruised the tract nor counted hardwood stumps for the purpose of making an estimate of the damage.
Sharp testified that based on his 9-year experience with timber land, he felt that Bradley unnecessarily cut lots of hardwood trees and saplings, that his property lost value because it was aesthetically damaged, and that he felt that the property had good potential for hunting due to its close proximity to Shreveport. Other than Sharp's own self-serving testimony, no other evidence was submitted on this issue.
After reviewing the testimony and photographic evidence, we conclude that *508 the record lacks any evidence tending to prove that Sharp sustained damages for anything other than the minimal and incidental hardwood damage as testified to by Bryant and others. As stated above, Sharp failed to present any testimony other than his own with regard to most of his alleged damages. Thus, Sharp's second assigned error likewise lacks merit.

Conclusion
For the reasons stated above, we affirm the ruling of the trial court in favor of plaintiff, O. Kyle Bradley, d/b/a Kyle Bradley Logging. Costs of this appeal are assessed to defendant, H. Wayne Sharp, Jr.
AFFIRMED.
NOTES
[1] La. C.C. art. 1763 provides: "A real obligation is a duty correlative and incidental to a real right."
[2] Although Bradley asserted his ownership of the pine timber in his petition, plus Sharp's interference with his ownership rights, the petition asked for damages and not the right to harvest and maintain ownership of the pine timber. Sharp made no objection to the requested remedy, and his later actions converting the timber make the trial court's award of damages appropriate.