914 So.2d 1144 (2005)
PINNACLE OPERATING COMPANY, INC., Plaintiff-Appellee
v.
ETTCO ENTERPRISES, INC., Defendant-Appellant.
No. 40,367-CA.
Court of Appeal of Louisiana, Second Circuit.
October 26, 2005.
*1145 Sinclair Law Firm, L.L.C., by Scott C. Sinclair, Shreveport, for Appellant.
Klotz, Simmons & Brainard, by David Klotz, Shreveport, for Appellee.
Before STEWART, CARAWAY and MOORE, JJ.
MOORE, J.
ETTCO Enterprises, Inc., defendant in the main demand and third party plaintiff herein, appeals the judgment of the trial court dismissing its third party claim against Jack T. Everett and Marcy G. Everett ("Everett"). ETTCO demanded that Everett honor a farmout agreement signed by his predecessors in title but never executed, or pay damages for unjust enrichment. We affirm.

FACTS
In 1994, ETTCO began operating the James Whitney Well which was producing oil and gas condensate from the James Lime Formation (sometimes hereinafter "the James") situated in Section 25, Township 10 North, Range 14 West, Sabine Parish, Louisiana. ETTCO believed it owned all the working interests[1] in the well that it had acquired from White & Ellis, who drilled the well in 1980 pursuant to a farmout[2] dated September 28, 1979 *1146 ("1980 Farmout"). The 1980 Farmout was not recorded. All but two small working interest owners, Jack T. Everett and Perry Holloway, signed the farmout agreement. Those two did not sign the farmout agreement as written because they wished to retain all their leasehold rights from the surface down to the top of the James, but apparently each expressed an interest in farming out the James Lime Formation to White & Ellis under those modified terms. Holloway subsequently signed a letter agreement that amended the farmout to assign his interest in the James Lime Formation only.
There is no document in evidence showing that Everett signed a similar letter agreement or the original farmout to White & Ellis. Everett testified that he did not remember ever signing the White & Ellis 1980 Farmout agreement or a letter agreement. On the other hand, Everett did receive overriding royalty[3] checks from ETTCO's James Whitney Well and he deposited those payments. One of ETTCO's contentions is that Everett acted as though he had farmed out his interest in the James formation, even though it could not produce a written document with his signature showing that he was also one of the original farmors or that he had assigned his interest in the James formation while reserving an overriding royalty.
By drilling and completing the James Whitney Well, White & Ellis earned the right to assignments[4] of the working interests in the James formation in Section 25, but, critically, those assignments were never executed and recorded, even though White & Ellis and ETTCO paid overriding royalties to the 1980 farmors pursuant to the farmout agreement as though the assignments had been made. Although ETTCO took over operation of the James Whitney Well in 1994, a written assignment from White & Ellis's (unrecorded) interest to ETTCO was not recorded until May 19, 2000.[5]
During the period from 1988 until 1998, Everett and his alter-ego corporation, the Ganja Corporation, acquired assignments of all the working interests of the three original mineral leases affecting the mineral rights in Section 25 which was owned by Everett and the other eight farmors of the 1980 Farmout, and he recorded these acquisitions. A review of those assignments show that the farmors' rights to the leases were conveyed without any depth delineations or reservations pertaining to their leasehold interests. ETTCO contends that when Everett acquired these assignments, he did not think he was acquiring the working interests to the James Lime Formation because he believed those leasehold rights had been assigned to White & Ellis *1147 pursuant to the 1980 farmout. ETTCO contends that Everett thought he was acquiring the rights to deeper geological strata or formations, including the Hosston Formation. At trial ETTCO adduced evidence that when Pinnacle Operating Company, Inc. ("Pinnacle") approached Everett about purchasing his leasehold interests in the James formation, Everett initially did not think he owned it. Ultimately, ETTCO contends, that when Everett assigned the leasehold interests that he had acquired from the 1980 farmors, he required Pinnacle to agree to indemnify him regarding any disputes as to the James.
On February 28, 2000, Everett and his wife and the Ganja Corporation executed two assignments to Pinnacle conveying all their working interests in the James Lime Formation in exchange for $80,000 and an overriding royalty. At the time when Pinnacle acquired the assignment, ETTCO was producing oil and gas condensate from the James Whitney well. The Shreveport District Office of Conservation refused to give Pinnacle a permit to drill a well to the James Lime Formation in Section 25 even though Pinnacle held the record title to the mineral leasehold rights. On February 7, 2003, after ETTCO refused to surrender possession of the mineral leasehold interests and the James Whitney Well and give an accounting of production from the time it (Pinnacle) acquired record title, Pinnacle filed suit against ETTCO.
ETTCO filed third party demands against Everett[6] alleging that, by virtue of the instruments by which he obtained assignments of the working interests in Section 25 of the original farmors of the White & Ellis Farmout agreement, Everett assumed the obligations of the original farmors or, alternatively, that Everett was liable for damages under a theory of unjust enrichment.
By partial summary judgment certified as a final, appealable judgment, the trial court held that Pinnacle was the owner of all the working interests in the James Lime Formation and the James Whitney Well, finding it was a good faith purchaser relying on the public records. ETTCO was ordered to pay $29,185 in net proceeds from production plus interest. ETTCO did not appeal this judgment and it is now a final judgment.
The third party demands were tried in a bench trial. After briefly taking the case under advisement, following which counsel simultaneously submitted proposed findings of fact and conclusions of law, the court rejected ETTCO's third party demands against Everett, holding that Everett did not assume the personal obligations of the original farmors in the White & Ellis Farmout. The trial court's well-reasoned opinion also held that ETTCO was not entitled to recover under a theory of unjust enrichment. ETTCO subsequently filed this appeal as to the judgment dismissing its third party demands only.

DISCUSSION
At the outset, we note that by virtue of the now-final partial summary judgment, Pinnacle was found to be the owner of the leasehold rights in question. ETTCO did not appeal that judgment nor did it argue that the judgment was in error or clearly wrong in this appeal. In that judgment the trial court found, and ETTCO concedes, that Pinnacle was a protected third party purchaser under the public records doctrine.
*1148 The legal principles expressed in the public records doctrine and the writing requirement regarding the transfer of immovables also govern ETTCO's third party demands against Everett. La. R.S. 31:18[7] defines mineral lease rights as incorporeal immovables subject to the laws of registry and La. C.C. art. 1839[8] requires that the transfer of immovable property be in writing.
By its first assignment of error, ETTCO urges that the trial court erred by failing to find that Everett became liable to ETTCO for the obligations of the original 1980 farmors to give an assignment of the working interest to the James. This liability, ETTCO argues, arises out of the following language in some of the lease assignments:
[A]ll of Assignors' right title and interest in and to the well bores and all equipment and appurtenances ..., as well as any interest which Assignors might own in any of the leases covering the above sections.
Assignee assumes, from effective date of this assignment, any and all liabilities associated therewith, including, but not limited to, restoration of surface and plugging and abandonment in accordance with the rules as provided by the Louisiana Department of Conservation.
Other assignments have the following language:
Assignee agrees to protect, defend, indemnify and hold assignor and its employees free and harmless from and against any and all costs, expenses, claims, demands and causes of action of every kind and character arising out of, incident to, or in connection with the above-described leases ... regardless of whether the liability therefor is based on some alleged act or omission of Assignor, or Assignee, or some other party.
Based on these provisions, ETTCO contends that Everett assumed all of his assignors' (the 1980 Farmors) liabilities that are "associated with" or "incident to" or "in connection with" the leases. The trial court rejected ETTCO's argument that this language obligated Everett to assign the working interest in the James formation, holding that the obligation of the farmors was a personal obligation and any assumption of the obligation of the farmors to assign the leases must be expressly consented to by the assignee in writing. ETTCO now contends that the trial court's holding runs contrary to Louisiana law, citing language from the case of Davis Oil Co. v. TS, Inc. 962 F.Supp. 872 (E.D.La.1997) rev'd, 145 F.3d 305 (5 Cir.1998).
In Davis Oil Co., supra, a dispute arose over whether the purchaser of all of an assignee's assets also assumed the assignee's obligation in a particular lease to plug and abandon all wells on the leased premises, to remove all structures and facilities serving the wells, and to retrieve and properly dispose of surface contamination. The defendant, TS, Inc., argued that because *1149 the sale documents did not expressly reference the particular lease and the plug and abandon language therein, it could not be held to have assumed any obligations owed by the original lessee, citing language from two Fifth Circuit cases for the proposition that an obligation is not assumed unless it is specifically identified in the contract language.[9] The district court in Davis Oil stated that the reasoning of the two cases "simply cannot support the sweeping prohibition against general assumptions that defendant advocates." Rather, the court said that the Fifth Circuit in Chevron and Joslyn actually followed the rule that "the intent to assume an obligation must be `clearly expresse[d]' and `apparent from the face of the documents.'" Davis Oil Co., supra at 882-83. The court ultimately held that the defendant did not assume the obligation to abandon and plug. The Fifth Circuit reversed, holding that express language in the sales contracts provided for an assumption of the assignee's liabilities that arose "in the ordinary course of the oil and gas business ... carried on with those assets ... designated as part of the oil and gas division." The court concluded that these contractual provisions required the successor corporation to assume those obligations arising out of the day-to-day operations and clearly contemplated assumption of the assignee's plug and abandon obligations in the lease.
La. C.C. art. 1821 governs assumption of obligations. An assumption of an obligation must be made in writing. Whittington v. Louisiana-Pacific Corp., 385 So.2d 863 (La.App. 2 Cir.), writ denied 393 So.2d 738 (La.1980). As noted in Davis Oil Co., supra, the intent to assume the obligation must be clearly expressed on the face of the documents. The provisions of the assignments cited by ETTCO indicate only that Everett is obligated to comply with the terms and provisions of the oil and gas leases related to the assigned leasehold interests after the effective date of the assignments. They also obligated Everett to protect the assignor from any claim or cause of action arising from operations conducted by Everett with respect to the assigned leasehold interests after the effective date of the assignments.
We also note that those assignments expressly say that the assigned leases "may be subject to the terms and conditions of certain agreements even though they are not described in the assignment or [they] are not recorded." This means that Everett acquired the assigned leasehold interests subject to any unrecorded agreement, and under Louisiana law, Everett did not assume any personal liability with respect to fulfilling any obligations under an unrecorded agreement affecting such leasehold interests.
La. C.C. art. 1764 describes the effects of real obligations when the land burdened by such obligations is transferred:
A real obligation is transferred to the universal or particular successor who acquires the movable or immovable thing to which the obligation is attached, without a special provision to that effect.
But a particular successor is not personally bound, unless he assumes the personal obligations of his transferor with respect to the thing, and he may liberate himself of the real obligations by abandoning the thing.
See also, Coldwell Banker J. Wesley Dowling & Associates, Inc. v. City Bank & Trust of Shreveport, 602 So.2d 1051 (La.App. 2 Cir. 6/24/92).
*1150 In Bradley v. Sharp, 793 So.2d 500 (La.App. 2 Cir.2001), this court explained how a party acquiring immovable property rights can acquire those rights subject to the unrecorded real right of another party. Bradley involved the sale of a tract of 159 acres of timber and land which were sold separately within a two-day period. The land purchaser recorded his deed prior to the timber purchaser. He later attempted to block the timber purchaser from harvesting his timber, claiming that under the public records doctrine, he was a good faith purchaser who purchased the land not subject to the unrecorded timber deed. We rejected this claim because the landowner's deed expressly acknowledged that the buyer was aware that the pine timber was sold under contract, although the buyer did not expressly assume the personal obligations of the vendor who sold the timber. Rather, the land was acquired subject to the real rights of the timber owner as expressly referenced in the sale deed.
The instant case is distinguishable from Bradley, however, in that the broad lease assignments to all depths and strata from the 1980 farmors did not clearly express with any degree of specificity "the terms and conditions of certain agreements ... not described herein or ... recorded" to which the assigned leases might be subject. The farmors could have expressly made Everett subject to the unrecorded farmout agreement, which included the obligation to assign the James rights, or alternatively, they could have reserved in themselves the James rights which they owed to White & Ellis/ETTCO.
As noted in the trial court's opinion, "[t]he only assignment that even mentioned any Farmout Agreement pre-dated the [1980 Farmout] in this case by five years and indicated that the assignment was `subject to' the agreement  not an assumption of same." Hence, the trial court implicitly recognized that to make the assignment subject to the farmout, it must be expressly identified.
The trial court also noted that part VIII of the 1980 Farmout stated: "This Agreement is personal in nature and may not be assigned without our written consent being first obtained." Of course, White & Ellis never received assignments from the 1980 farmors, even though White & Ellis and ETTCO paid overriding royalties as though the assignments were made.
Accordingly, Everett neither assumed the obligations to make the assignments under the 1980 farmout nor did he become subject to any real obligation from the provision in the assignments making them subject to "certain agreements" neither described or recorded.
By its second assignment of error, ETTCO contends that the trial court erred in failing to uphold its claim for unjust enrichment. It alleges that since Pinnacle is protected by the public records doctrine, it has no remedy at law.
A threshold requirement to an unjust enrichment claim is that there exists no other remedy at law for the claimant at whose expense another has been enriched. La. C.C. art. 2298. In this case, however, White & Ellis had a remedy against the 1980 farmors to obtain the assignments under the farmout agreement. White & Ellis assigned its interest in the James formation to ETTCO, even though it had never received such assignments. Both White & Ellis and ETTCO paid royalties to the 1980 farmors for production from the James formation, and the farmors acted as though they had made the assignments to White & Ellis/ETTCO. Based upon these facts, we believe that ETTCO has a remedy against either White & Ellis or the 1980 farmors, or both.

*1151 CONCLUSION
The language in the assignments to Everett and Ganja do not specifically assume the personal obligations of the Farmout Agreement, nor was there express language in the assignments that made Everett and Ganja subject to the farmout.
ETTCO and its predecessor have or had remedies at law that render the claim for unjust enrichment untenable. For these reasons, the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] The term "working interest" is synonymous with the extent of a lessee's "leasehold interest" in a tract or subsurface geological strata thereunder.
[2] A "farmout" is an arrangement by which another operator drills a test well in return for a percentage interest in the lease. Williams & Meyers, Oil and Gas Law, § 103, p. 8.
[3] Typically, the term overriding royalty is used to describe a royalty carved out of the working interest created by an oil and gas lease. "An overriding royalty is an interest severed out of the working interest or lessee's share of the oil, free of the expenses of development, operation and production. Its duration is limited to the life of the lease from which it was created." Williams & Meyers. Oil and Gas Law. § 418 (1991).
[4] Although we use the term "assignment" to denote the conveyances herein, in Louisiana, when a lease is assigned to another with a reservation of an interest such as an overriding royalty, it is deemed a sublease. Bond v. Midstates Oil Corp., 219 La. 415, 53 So.2d 149 (1951).
[5] Although the document is undated, the signatures were acknowledged before a notary on April 18, 2000.
[6] ETTCO filed third party demands against all of the original farmors to White & Ellis from whom it acquired its interests, but according to ETTCO, the other original farmors have not been served.
[7] La. R.S. 31:18 reads:

A mineral right is an incorporeal immovable. It is alienable and heritable. The situs of a mineral right is the parish or parishes in which the land burdened is located. All sales, contracts, and judgments affecting mineral rights are subject to the laws of registry.
[8] La. C.C. art. 1839 reads:

A transfer of immovable property must be made by authentic act or by act under private signature. Nevertheless, an oral transfer is valid between the parties when the property has been actually delivered and the transferor recognizes the transfer when interrogated on oath.
An instrument involving immovable property shall have effect against third persons only from the time it is filed for registry in the parish where the property is located.
[9] Chevron USA, Inc. v. Traillour Oil Co., 987 F.2d 1138 (5 Cir.1993) and Joslyn Manufacturing Co. v. Koppers Co., Inc., 40 F.3d 750 (5 Cir.1994).