CARAWAY, J.
hln this suit for an accounting, the owner of a convenience store sues a petroleum products distributor who supplied gasoline and petroleum products to the store. The products were delivered on a consignment basis and the dispute involved plaintiffs share of the difference between the defendant’s cost and the retail prices realized in customer sales. The trial court determined that only an implied, unwritten contract existed between the two parties and that the plaintiff was not entitled to reim *167 bursement for the defendant’s pricing of the products and its charging of fees. This appeal by the convenience store owner ensued. Finding no manifest error in the trial court’s ruling, we affirm.

Facts

In 1981, Stephen Kelley and Ray Watson began the operation of a convenience store located at 101 Bernice Highway in Farmerville, Louisiana, which eventually came to be known as One Stop. Because the business also sold retail gasoline, the partners entered into a 10-year (August 12,1981-August 12, 1991)[1] “Dealer’s Commission Contract” with Pinrod Petroleum, Inc., for the installation and maintenance of underground storage tanks, fuel pumps, and other fuel-related items at the convenience store. By the agreement, Pinrod also supplied fuel to the location on consignment and agreed to split profits from retail fuel sales with the partners. Specifically, that provision of the Dealer’s Commission Contract which dealt with the splitting of profits read as follows:
| gAll gasoline furnished by Seller shall be sold by Dealer at prices established by Seller. Dealer shall be compensated for work and services performed hereunder; a commission from Seller equal to one-half of the difference between Seller’s invoice cost for gasoline or other petroleum products, plus common carrier freight rate and the retail price at which such product is sold. Dealer will have a $.02 down stop on commission from Seller.
In 1997, the store property was acquired by Kelson Investment Group, Inc. (“Kel-son”), which was owned by Kelley. Kelson ceased operating the convenience store and leased the premises to other parties. Before it began leasing, on February 17, 1997, Kelson and Central Oil & Supply Corporation (“Central Oil”), the petroleum products distribution business which was a successor company to Pinrod, entered into a 15-year lease (hereinafter the “Lease”) under which Central Oil agreed to install and maintain a canopy, read-out equipment, sign and concrete pump islands and foundation for the canopy. Central Oil also agreed not to “arbitrarily refuse to supply Lessor with fuel while at the same time supplying other stations.”
Thereafter, Kelson leased the property to ZZ Corporation (“ZZ”) under a Commercial Lease with a term beginning on March 1, 1997 and ending February 28, 2002. Paragraph 10 of the Lease reads as follows:
Dealers Commission Contract: In addition LESSEE acknowledges and takes cognizance of that certain Dealers Commission Contract heretofore entered into by LESSOR, with CENTRAL OIL CO., INC., concerning the sale of gasoline at the subject premises, and LESSEE agrees to fully comply with and abide by all of the terms, conditions and provisions of the said Dealers Commission Contract, without exception whatsoever, a copy thereof having been heretofore furnished by LESSOR unto LESSEE. LESSEE agrees to indemnify and hold LESSOR from any liability to CENTRAL OIL CO., INC., in connection therewith, and to fulfill all of the terms, conditions and provisions thereof, as fully and as completely as LESSOR was obligated to do.
|sOn March 1, 1997, Central Oil and ZZ entered into an “Operating Agreement” or “Pump and Tank Agreement” (hereinafter the “Operating Agreement”) in which Central Oil agreed to “furnish the necessary petroleum products for the operation of retail petroleum products business on the *168 said location.” In relevant part, the parties agreed that Central Oil was to be “responsible for all property taxes and assessments in the gasoline dispensing operation.” Further, Central Oil and ZZ agreed to “divide equally gross profits derived from the sale of petroleum products at retail in the location.” The agreement described the calculation of gross profits as follows:
a) The dollar revenue generated from gross sales of petroleum products at retail;
b) Minus the rack price of petroleum products including the least expensive cost of freight by motor carrier;
c) The resulting figure is the gross profits.
The term of the Operating Agreement was for the “period of time concurrent with a lease of the property to Supplier [Central Oil] by Stephen R. Kelley.”
ZZ operated One Stop until 1999, when Zia Corporation (“Zia”) purchased the business. Zia had been formed in 1999 by one of the partners of ZZ, Malik Zia. Kel-son and Zia entered into a 3-year commercial lease (May 15, 1999 to May 14, 2002) but no operating agreement with Central Oil was executed.
Zia sold One Stop to T.H. International, Inc. (“T.H.”) in January of 2001. Kelson entered into a new commercial lease with T.H. on January 11, 2001, but T.H. executed no operating agreement with Central Oil.
|4In July of 2001, the plaintiff, MK International, Inc. (“MK”), through its president, Manzoor Hussain Chaudhry, purchased the assets of One Stop from T.H. A “Contract for Purchase of Business Assets” was executed between the parties. The assets sold to MK included the goodwill of the business, the T.H./Kelson Commercial Lease, the inventory of goods, furniture, fixtures and equipment, and certain equipment leases. On July 6, 2001, Kelson and MK entered into a Commercial Lease for the property which contained the same language regarding the application of the Dealer’s Commission Contract quoted above. The original term of the lease was October 1, 2001 to September 30, 2010. MK apparently operated the convenience store until 2009. Throughout this time, Central Oil supplied the fuel sold at the gas pumps without a written operating agreement with MK. In its accounting for sale of gasoline, Central Oil used the rack price of the gas on the date of invoice and included Autosend, UST fees, Superfund tax, Oil Spill Liability Fund and Fuelman fees in the invoices. From this, Central Oil made the calculation of profits.
In June of 2003, Chaudhry wrote a letter to Central Oil complaining about the manner in which Central Oil calculated and split profits. Chaudhry urged the application of the provisions of the Operating Agreement between Central Oil and ZZ as the proper method. He contended that Central Oil’s use of the rack price on the day of invoice and inclusion of fees on the invoices were not in accordance with the agreement. When the parties could not reach an agreement, MK instituted this suit for | ^accounting and injunction[2] against Central Oil seeking reimbursement for underpayment of profits and fees.
At trial, four witnesses testified.[3] Hardeman Cordell, the president of Central Oil, testified that Central Oil had been in the convenience store business since 1985. He first operated Pinrod Petroleum, a predecessor to Central Oil, and contracted with Kelley and Watson. Cor- *169 dell explained that in the original Dealer’s Commission Contract, Pinrod leased the piece of property in order to install petroleum dispensing equipment at the store. The original Dealer’s Commission Contract was extended through 1996 and carried forward until Central Oil and ZZ entered into the Operating Agreement. Cordell testified that the Dealer’s Commission Contract was essentially nonexistent after March 1, 1997, even though it was mentioned in the various leases. Cor-dell testified that fees related to tanks including Superfund taxes and underground storage fees were “pass through fees” that were not an expense of his company. Over the years fees came into existence that were mandated by the state including underground storage tank and oil spill fees.
Cordell testified that the Central Oil/ZZ Operating Agreement provided that Central Oil would be responsible for property taxes and assessments in the gasoline dispensing operation and also provided for a division of profits. The term of the Operating Agreement was the same as the Kel-son/Central Oil equipment lease.
16Cordell stated that from July 2001 to the end of 2009, Central Oil supplied fuel to MK for One Stop. Cordell identified the June 26, 2003, letter in which Chaudhry contested the division of profits and set forth MK’s calculations. Cordell testified that Chaudhry’s calculations were not correct because “we bill off a rack price,” although he understood Chaudhry’s method of calculating profits. He explained that the rack price was the price that Central Oil paid to the refiner when it purchased the product. In billing, Central Oil utilized the rack price on the date of the invoice, not on the day of MK’s purchase. Cordell explained that Central Oil usually received notice of the .rack price by six o’clock in the evening and that Central Oil used the rack price with all of its customers. Cordell testified that Chau-dhry’s calculations were based upon “average inventory costs,” which Cordell explained was what Central Oil paid plus freight. Cordell testified that the average inventory costs distribution of profits was not used because of the lag time between the distribution of the fuel and when costs could be calculated. He stated that when the market was rising and the prices moved fast, with the use of the average inventory cost method, Central Oil would get to the point where it would not collect enough money to replenish its inventory. Cordell testified that the rack price would “average out over a period of time.” He did concede that the average inventory costs method could be more reflective of the costs of the fuel in the tanks.
In Cordell’s opinion, One Stop had a turnover time for regular fuel that was “pretty often” while Premium and Plus fuel could take two to three 17weeks, Cor-dell considered One Stop to be a low volume store. Central Oil paid for the fuel that was put in the tanks and owned the gasoline until it was dispensed to customers. The costs associated with keeping up the dispatch was borne by Central Oil. Central Oil offered to allow MK to buy the fuel beforehand and “carry the inventory,” but MK declined. Central Oil drafted MK’s account twice a week. The amount of fuel sold by One Stop was determined by daily meter readings which were placed on a dispatch sheet. The dispatcher would call in the numbers daily. The information could also be punched into an auto send system.
. Cordell’s understanding of the agreement Central Oil had with One Stop is that Central Oil would take the rack costs of fuel on the day of billing and add freight and all applicable taxes and fees to the amount. From that number, the retail *170 price would be deducted and the difference would be split with One Stop. Cordell testified that the difference between Central Oil’s costs and the retail price is profit and that the distribution of profits was 50/50 split.
Cordell testified that Central Oil never had a written agreement with MK for the division of profits and had no knowledge that ZZ assigned the Operating Agreement to any other corporation. He stated that upon MK’s taking over the convenience store, the business transactions with Central Oil continued as usual. Cordell acknowledged that he did not have anything in writing from MK by which the plaintiff agreed to utilize the rack price on the day of invoice; however, he stated “that’s the number we always use.” He added “that’s how we billed him and did that from day one.” Cordell [^testified that Chaudhry did not complain about the profits for two years before June 2003. He stated that Central Oil divided profits the same way with ZZ, Zia and T.H. and that the day-to-day operations between Central Oil and the convenience store owners has been conducted the same for years. Central Oil had no other disputes with any other operator.
Manzoor Chaudhry testified that he purchased One Stop in July of 2001. At the time of the purchase, he did not have an understanding of how he would be compensated for distributing Central Oil’s gas. Cordell showed him the Operating Agreement between Central Oil and ZZ and he received a copy of the document when he purchased the establishment. He understood that the Operating Agreement governed his relationship with Central Oil because the agreement stated that it was for a 15-year term for the location at 101 Bernice Highway and was applicable to all successors of the business. An unrelated dispute over an invoice sent to One Stop caused Chaudhry to examine all of the invoices from Central Oil more carefully. When he examined the invoices, Chaudhry “found that it was very imbalanced distribution of the gross profit between us and Central Oil.” He sent a letter of complaint to Cordell and referenced the Operating Agreement. Chaudhry felt that the average inventory cost was closer to the actual costs of the gas. He did not dispute that One Stop and Central Oil were to divide profits equally. He disputed the method used to divide the profits because Central Oil used the rack price on the day of invoice which had nothing to do with the gas actually sold. Chaudhry conceded that for lotwo years, he did not look into the invoice documentation sent to One Stop by Central Oil.
Chaudhry testified that he discussed the matter with Cordell on July 12, 2003, and waited for a response from Central Oil which never came. Chaudhry also met with Cordell in 2009. At the meeting, Cordell indicated that his method of calculating profits was in accordance with the Operating Agreement. Chaudhry testified that the Operating Agreement did not mention his responsibility for Autosend, underground storage tank fees, credit card fees, the Fuelman expenses, oil spill liability fund or taxes.
Chaudhry stated that his accountant, Joel Taylor, prepared a report which included a random sampling of invoices and calculation of benefits using the average inventory costs method. The calculations indicated that One Stop was underpaid $49,296 in profits and had overpaid $28,504 in fees.
Chaudhry admitted that MK had no contract with ZZ or received an assignment of the Operating Agreement. He could only assume that ZZ and Central Oil handled invoicing in accordance with his view of the Operating Agreement but he had no dii'ect *171 knowledge of that fact. MK’s asset purchase agreement in 2001 did not reference the Operating Agreement between ZZ and Central Oil.
Joel Taylor testified on behalf of MK and was accepted as an expert in accounting. Taylor testified that he utilized the average inventory costs method to calculate the profit variances on gasoline prices sold at One Stop between July of 2001 and June of 2009 and prepared the report referred to | inby Chaudhry. Taylor admitted that the Operating Agreement only referred to rack price and that he saw no agreement which indicated that the average inventory costs method was the proper method to be utilized. Taylor assumed that the fees were not part of profit division between Central Oil and MK.
James Moore, former president of Moore Oil Company, testified on behalf of Central Oil and was qualified as an expert in petroleum products, marketing and distribution. Moore testified that Central Oil’s method of billing based on rack price would be consistent with industry standards and was a fair and reasonable way to divide profits, considering the volatility of the petroleum business and that the risk of market fluctuation was borne by the distributor. Moore believed that the use of average inventory costs was not a practical method of accounting. Moore testified that fees and taxes were pass through amounts for which Central Oil would not profit and could appropriately divide with MK.
After hearing the testimony and considering the evidence, the trial court rejected the claims of MK upon determining that Central Oil’s use of the rack price at invoice and inclusion of certain fees in the calculation of profits were in accordance with industry standards and constituted the agreement between the parties.

Law

 A party claiming the existence of a contract has the burden of proving that the contract was contracted between himself and his opponent. La. C.C. art. 1831; Price Farms, Inc., v. McCurdy, 45,409 (La.App.2d Cir 17/7/10),11 42 So.3d 1099. The trial court’s conclusion regarding the existence of a contract is a finding of fact which may not be disturbed on appeal unless it is found clearly wrong. Id.
When a writing is not required by law, a contract not reduced to writing, for a price or, in the absence of a price, for a value not in excess of five hundred dollars may be proved by competent evidence. If the price or value is in excess of five hundred dollars, the contract must be proved by at least one witness and other corroborating circumstances. La. C.C. art. 1846. This sufficiency of proof is correlated with the credibility of witnesses and the trial court’s conclusions must be accepted, unless they are manifestly erroneous. Samuels v. Firestone Tire & Rubber Co., 342 So.2d 661 (La.1977); Kilpatrick v. Kilpatrick, 27,241 (La.App.2d Cir.8/23/95), 660 So.2d 182, writ denied, 95-2579 (La.12/15/95), 664 So.2d 444.
Although a contract is worded in general terms, it must be interpreted to cover only those things it appears the parties intended to include. La. C.C. art. 2051. A doubtful provision must be interpreted in light of the nature of the contract, equity, usage, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. La. C.C. art. 2053. Usage is a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation. La. C.C. art. 2055.
Rights and obligations arising from a contract are heritable and assigna *172 ble unless, the law, the terms of the contract or its nature preclude such effects. La. C.C. art. 1984. The legal right that a person has against [12another person to demand the performance of an obligation is called a personal right. Distinct from a real right, which can be asserted against the world, a personal right is effective only between the parties. La. C.C. art. 1758; Eagle Pipe and Supply Inc. v. Amerada Hess Corp., 10-2267, 10-2272, 10-2275, 10-2279, 10-2289 (La.10/25/11), 79 So.3d 246. A personal right cannot be asserted by another in the absence of an assignment or subrogation. Eagle Pipe and Supply Inc., supra; Pinnacle Operating Co. Inc. v. Ettco Enterprises, Inc., 40,367 (La.App.2d Cir.10/26/05), 914 So.2d 1144; Rowan v. Town of Arnaudville, 02-0882 (La.App. 3d Cir.12/11/02), 832 So.2d 1185.
La. C.C. art. 3506(28) specifically defines successor as, generally speaking, the person who takes the place of another. There are in law two sorts of successors: the universal successor, such as the heir, the universal legatee, and the general legatee; and the successor by particular title, such as the buyer, donee or legatee of particular things, the transferee. The particular successor succeeds only to the rights appertaining to the thing which is sold, ceded or bequeathed to him.
 Sale is a contract whereby a person transfers ownership of a thing to another for a price in money. The thing, the price, and the consent of the parties are requirements for the perfection of a sale. La. C.C. art. 2439. The contract of sale is perfected when one party consents to give a certain thing for a price in money and the other consents to give the price in order to have that thing. Benglis Sash & Door Co. v. Leonards, 387 So.2d 1171 (La.1980); Lawrence v. Terral Seed, Inc., 35,-019 (La.App.2d Cir.9/26/01), 13796 So.2d 115, writ denied, 01-3134 (La.2/1/02), 808 So.2d 341. Although there must be consent to give and to accept a price, it is not essential that the specific sum of the sales price be stated at the time of contracting. The parties can agree that the price may be ascertained by computation or that the price may be fixed by arbitration. Or the parties can consent to buy and to sell a certain thing for a reasonable price, and when they do, the contract of sale has been perfected. Benglis Sash & Door Co., supra.

Discussion

MK’s argument on appeal centers on its assertion that the 1997 Operating Agreement executed between Central Oil and ZZ is the binding written agreement which requires Central Oil to account in a different manner for the sale/consignment price of its products. MK claims Central Oil’s accounting method for the determination of the price violates that which is called for in the Operating Agreement. The trial court found that the parties “either orally or tacitly, agreed to split the profits from the gasoline sales” and that no written agreement exists between the parties. The important implications of that ruling are: (1) that there is no long-term contract between the parties constraining Central Oil to charge its prices in a particular manner, and (2) MK is not obligated to Central Oil to acquire and sell its gasoline products. Furthermore, since MK did in fact receive marginal revenue over and above Central Oil’s charge for each gallon sold to customers at One Stop, MK’s claim for $49,296 in damages represents 114onIy its loss of a higher net profit on such sales if a breach of contract occurred.
From our review of the testimony, documentary evidence, and the above law, we agree with the trial court that no existing written contract for a term governed the parties’ relationship. Upon its acquisi *173 tion of the business in 2001, the two written contracts executed by MK were the “Contract for Purchase of Business Assets” with T.H. and the Commercial Lease with Kelson. In those contracts, MK did not assume any obligations of those parties with Central Oil concerning the purchase and pricing of Central Oil products.
The only prior contract which MK recognized in 2001 was referenced in MK’s lease agreement with Kelson. The lease stated that MK acknowledged the prior Dealer’s Commission Contract between Kelson and Central Oil “concerning the sale of gasoline at the subject premises.” In actuality, the original Dealer’s Commission Contract of 1981 was between the predecessors of both Kelson and Central Oil. The only contract existing between Kelson and Central Oil at the time of MK’s Commercial Lease in 2001 was the February 1997 Lease concerning the gasoline dispensing equipment which Central Oil maintained on the property. In the Kel-son/Central Oil Lease, Central Oil was obligated not to arbitrarily refuse to supply Kelson with fuel. Yet, no details regarding the pricing of fuel by Central Oil were specified. Moreover, even if MK somehow assumed any obligations of the 1981 Dealer’s Commission Contract that may have been Instill extant, MK makes no argument that its asserted accounting/pricing for Central Oil’s products is specified in the 1981 agreement.
Additionally, from our review of the 1997 Lease between Kelson and Central Oil, it is also important to note that at that time Kelson did not bind itself to the terms of the 1997 Operating Agreement. The 1997 Operating Agreement was therefore the personal contract existing solely between the two parties to the agreement, Central Oil and ZZ. Central Oil and ZZ were each lessees of Kelson under separate lease agreements for different uses and possessory rights to the One Stop premises. Therefore, the Operating Agreement would govern their relationship only as long as they remained in possession of their separate lease rights or for a maximum term of 15 years. When ZZ chose to end its lease of the store with Kelson, ZZ was authorized under the terms of the Operating Agreement to give 30-day written notice to Central Oil and to unilaterally withdraw from the Operating Agreement. Whether or not that notice was actually given in 1999, ZZ effectively ended its contractual relationship with Central Oil at that time. The rights and obligations of the Operating Agreement were never assigned by ZZ to another party at the conclusion of ZZ’s lease of the premises.
Accordingly, we affirm the trial court’s ruling that no written contract importing long-term obligations for the sale and purchase of Central Oil’s products governed these parties’ transactions. Since 2001, each delivery and sale of the product was a separate transaction. MK was at liberty to end its purchases upon becoming dissatisfied with Central Oil’s pricing.
116Finally, there is no showing from the evidence that any oral contract or meeting of the minds occurred whereby Central Oil ever agreed to charge prices calculated in the manner insisted by MK. Chaudhry’s testimony that Cordell referenced the prior Operating Agreement or impliedly adopted any specific accounting formula was rejected by the trial court. There was no showing of any new agreement obligating Central Oil to charge all future deliveries of its products according to Chaudhry’s accounting. Moreover, there was no evidence by MK challenging Cordell’s assertion that Central Oil’s method for accounting was the same which it employed for sales to ZZ pursuant to the former Operating Agreement.

*174
Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed. MK is cast with costs of the appeal.
AFFIRMED.
APPLICATION FOR REHEARING
Before GASKINS, CARAWAY, DREW, MOORE and LOLLEY, JJ.
Rehearing denied.

. On May 6, 1991, the parties apparently extended the agreement to August 12, 1996.

. On September 13, 2006, the trial court denied MK’s request for preliminary injunction.

. Each party stipulated to the documentary evidence submitted by the other.